**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRAVIS BUTLER, | ) | |
| | ) | Civil Action No. 08 - 1594 |
| Petitioner, | ) | Judge Arthur J. Schwab |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| RANDELL BRITTON; THE ATTORNEY | ) | |
| GENERAL OF THE STATE OF | ) | |
| PENNSYLVANIA, and THE DISTRICT | ) | |
| ATTORNEY OF COUNTY OF ALLEGHENY | ) | |
| | ) | |
| Respondents. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

### II. REPORT

Petitioner, Travis Butler, a state prisoner incarcerated at the State Correctional Institution at Coal Township, Pennsylvania, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Petition should be denied as without merit.

#### A. Relevant Factual and Procedural History

On September 17, 2002, Petitioner, Travis Butler, was charged with one count of Criminal Attempt (homicide), two counts of Aggravated Assault and one count of Criminal Conspiracy, as a result of the September 17, 2002 shooting of Jamar Melvin. On that date, at approximately 1:00 a.m., Melvin was riding his bicycle around the projects in Clairton when he saw five black males get into a small, red Chevy Malibu which was parked in the Millvue Acres housing complex.

Melvin recognized four of these individuals: Blake Smith; Petitioner; Petitioner's cousin, Greg Hood; and Petitioner's brother; he did not recognize the fifth person, Petitioner's Co-Defendant Ronald Anger. Before he got into the car, Anger asked Melvin where his cousin, William Sutton, was. Melvin replied that he was around here somewhere. Then Anger got into the driver's side and Petitioner got into the passenger seat and the five individuals drove away. Shortly thereafter, Melvin began riding his bike when he encountered Sutton, who had walked out of an alley, and they stopped to talk.

A short while later, the car returned with the five men still inside. Anger stopped the car about ten feet from Melvin and asked about purchasing some marijuana. Melvin did not answer as he thought Anger was talking to Sutton. Anger and Petitioner then each pulled out a handgun and fired several shots at Melvin and Sutton. Sutton managed to get away but Melvin suffered gunshot wounds to his torso, legs and arms and spent a month and a half in the hospital.

At 1:40 a.m., City of Duquesne Police Sergeant, Jeffrey Dolansky received a "be on the lookout for" call for a red Chevy Malibu containing five black males who were wanted for questioning in a Clairton shooting. A few minutes later, the officer spotted the car and began following it. When he activated his lights and siren, the car stopped abruptly and four people got out of the car and fled on foot. After backup arrived, Petitioner was discovered hiding in some weeds behind a garage. He then was handcuffed and an Astra model A-80 9 millimeter caliber handgun was recovered from inside his shirt. Subsequently, a gunshot residue test was performed on Petitioner at approximately 3:30 a.m.

After he was taken into custody and given his Miranda rights, Petitioner told police that he had been in Duquesne selling fake crack and hid in some bushes when the police cars came into the area. He further claimed that the gun was not found on his person, but rather had been lying on the

ground next to him. Petitioner stated that he was not in the red Chevy Malibu that had been pulled over, that he was not in Clairton that night, and he was not involved in the shooting of the victim. At that point, Petitioner was transferred to the Allegheny County Homicide headquarters where he was told that the firearm was being taken to the Crime Lab and would be tested against casings and projectiles recovered from the crime scene.

Ballistic evidence revealed that six of the eleven spent cartridge casings matched the test casings discharged from the Astra pistol that had been recovered from Petitioner. In addition, two discharged 9 millimeter bullets (one of which was recovered from inside the victim's clothing) matched those test fired from the Astra pistol. When Petitioner was told about the ballistics match, he admitted that he was in the vehicle when the victim was shot. In a statement made to police, Petitioner claimed that William Means picked him up at midnight and drove to Clairton, where they intended to get beer and meet with Smith and Hood. When they could not get any beer, they went to the Millvue Acres housing plan where they saw the victim and Sutton. Means stopped the car and asked the victim and Sutton if they had a problem with people from Duquesne. When either the victim or Sutton stated they did, Means pulled out a gun and began firing at the men. Petitioner also stated that he was carrying a gun. When Means began to fire shots at the victim and Sutton, Petitioner fired two shots into the air out of the passenger side window. Petitioner further stated that he ran from the car when police subsequently tried to stop them, and that the gun found on him was the gun he fired in Clairton. He told police that his gun was a 9 millimeter "Astro" and that Means had a 9 millimeter Ruger. Petitioner then agreed to have his statement tape recorded. Once again, he was given Miranda warnings. In the taped statement, he explained that the group in the car initially asked the victim where they could find Sutton so they could get some weed. They then drove around the corner and saw Sutton who told them that he did not have any weed. After circling

the block, Means then asked Sutton if he had a "beef with Duquesne n******s," and when he said that he did, Means pulled out a gun and started shooting. Petitioner claimed that Means fired about eight shots and that he (Petitioner) only fired two shots into the air.

Police then began to investigate Means and learned that he had been on the run for some time. Then police began to receive information on Anger and created a photo array to show to Melvin, who identified Anger as the driver of the vehicle and the man who had shot him. Anger was arrested and agreed to give a statement. Anger stated that he had been in a red Chevy Malibu, however, he was in the red Chevy Malibu on a night several weeks before the shooting. As the interviewed continued, Anger then stated that he had been in the red Chevy Malibu, but in the back seat, at the time the victim was shot. Eventually, during the interview, Anger admitted that he was driving the red Chevy Malibu when the victim was shot.

Anger told police that he had driven through the circle and seen the victim and Sutton and asked about weed. He said that when they came back a second time, he was driving, Smith, Hood and "Tone Tone Phil" were in the backseat, and another person was in the front passenger seat. He claimed that he thought he saw Sutton and the victim go toward their waistbands, at which point the front passenger opened fire. Anger said that he then took his own weapon, a 9 millimeter, and fired three or four rounds at Sutton. Anger also told police that a person named Marcus Davis had been arrested and was carrying the gun he (Anger) had used during the shooting. In the process of confirming this information, police learned that the recovered Ruger had been submitted for testing at the Crime Lab and ballistic evidence confirmed that the test cartridge cases fired from the Ruger matched the five remaining discharged cartridge cases recovered from the scene.

On July 1, 2003, a joint jury trial commenced before the Honorable Kathleen A. Durkin in the Court of Common Pleas of Allegheny County. On July 7, 2003 Petitioner and Anger were found guilty of all charges. On October 3, 2003, the court sentenced Petitioner to a term of 10 to 20 years imprisonment. Following the denial of post-sentence motions, Petitioner filed a Notice of Appeal to the Superior Court of Pennsylvania. On January 25, 2005, Judge Durkin issued her Opinion denying Petitioner's points on appeal (Answer, Ex. 12 (doc. no. ). On appeal, Petitioner raised the following claims.

1. Whether the evidence was insufficient to support Petitioner's convictions for attempted homicide and criminal conspiracy.

2. Whether the trial court improperly interfered with defense counsel's attempt to use a prior inconsistent statement to impeach the victim/witness.

3. Whether the trial court erred in instructing the jury that they could find the defendant guilty of Attempted Homicide if they found that the defendant "intended to commit the crime of homicide," rather than instructing the jury that, in order to convict, the Commonwealth must prove that the defendant had attempted to commit First-Degree Murder; *i.e.*, that the defendant intended to kill.

ECF no. 13-5.

On June 17, 2005, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence. His Petition for Allowance of Appeal with the Pennsylvania Supreme Court was denied on December 27, 2005.

On February 26, 2006, Petitioner filed a *pro se* petition pursuant to the Post-Conviction Relief Act (PCRA). New counsel filed an Amended PCRA Petition on November 16, 2006 raising the following issues.

1. Trial and subsequent counsel were ineffective in failing to challenge the propriety of the Trial Court's ruling prohibiting counsel from fully and fairly impeaching victim Jamar Melvin with his preliminary

hearing testimony, and in thereafter failing to make, preserve and pursue appropriate challenge thereto. This ruling was incorrect, and counsel should have been permitted to introduce into evidence the prior inconsistent sworn testimony of Mr. Melvin.

2. The Trial Court erred in improperly restricting and curtailing defense counsel's closing argument. . . . Second, the Trial Court sua sponte berated counsel and directed him to move to a different subject when he began to remind the jurors of the irrevocability of their verdict.

3. Mr. Butler's Sixth Amendment right to confront witnesses was violated when Allegheny County Police Officer Michael Garlicki testified to the contents of a statement which he had taken from non-testifying co-defendant Ronald Anger.

4. Trial counsel was ineffective in failing to conduct a comprehensive investigation of the ballistics evidence and in failing to determine which gun fired the bullets which struck a vital part of the victim's body.

5. Trial counsel was ineffective in failing to seek to suppress Mr. Butler's custodial statement given to the detectives.

6. Mr. Butler was prejudiced by the cumulative effect of the many aforesaid errors of his prior counsel, which adversely affected the truth-determining process and which entitle him to relief.

7. To the extent that their ineffectiveness caused or arguably led or contributed to any waiver of any of Mr. Butler's claims, all prior counsel were ineffective in failing to properly investigate the case, in overlooking and waiving the foregoing claims, in failing to allege the ineffectiveness of trial counsel for all of the reasons which are specifically stated above.

ECF no. 13-9.

On January 17, 2007, Judge Durkin issued an Order dismissing Petitioner's PCRA Petition.

On January 18, 2007, Petitioner filed a Notice of Appeal to the Superior Court. On January 25, 2007, Judge Durkin issued an Opinion addressing Petitioner's points on appeal (ECF no. 14-1, pp. 40-43). On appeal, Petitioner raised the following issues.

1.      Whether the trial court committed reversible error in prohibiting counsel from fully and properly impeaching victim Jamar Melvin with his prior inconsistent preliminary hearing testimony, in which he admitted that he had not seen Mr. Butler in the car at the time of the shooting. And whether trial counsel was ineffective in failing to properly seek and secure admission of this highly exculpatory testimony into evidence, thereby denying Mr. Butler his constitutional rights to confrontation, due process, fair trial, and the effective assistance of counsel.

2.      Whether the trial court erred in improperly restricting and curtailing defense counsel's closing argument when it limited defense counsel form arguing the significance of Mr. Melvin's prior inconsistent statements and when it Sua Sponte prohibited him from fully and fairly arguing the concept of reasonable doubt.

3.      Whether Mr. Butler's constitutional rights to confrontation, due process, and fair trial were unfairly violated under Bruton by the admission into evidence of an improperly redacted and highly prejudicial hearsay statement of his non-testifying co-defendant, who claimed that "Another Person" who was obviously Mr. Butler had fired a handgun at the victims.

4.      Whether the trial court erred in summarily dismissing Mr. Butler's claim that trial counsel was ineffective in failing to conduct a comprehensive investigation of the ballistics evidence with the assistance of an expert, where such an investigation would have likely demonstrated that the Astra Pistol attributed to him had not been fired at either of the victims.

5.      Whether the trial court erred in summarily refusing to find the ineffectiveness of trial counsel, where prior counsel failed to seek suppression of Mr. Butler's involuntary and illegal custodial statement which resulted from improper duress and unreasonably extended detention.

ECF no. 14-29.

On December 31, 2007, the Superior Court of Pennsylvania affirmed the trial court's order denying Petitioner's PCRA petition (ECF no. 14-5). Petitioner's Petition for Allowance of Appeal to the Pennsylvania Supreme Court was denied on July 1, 2008.

On November 16, 2008, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in this

Court raising the following claims.

1. Trial court committed reversible error and Petitioner was denied a fair trial where the court prohibited counsel from properly and fully impeaching the victim, Jamar Melvin, with his prior inconsistent preliminary testimony.

2. Petitioner was denied a fair trial where trial court improperly restricted and curtailed defense counsel's closing argument when it limited defense counsel from arguing the significance of the victim's prior inconsistent statements and when it sua sponte prohibited defense counsel from fully and fairly arguing the concept of reasonable doubt.

3. Petitioner's constitutional rights to confrontation, due process, and fair trial were unfairly violated, and violated under <u>Bruton</u> by admission into evidence of an improperly redacted and highly prejudicial hearsay statement of non-testifying co-defendant who claimed that another person who was obviously not Petitioner had fired a handgun at the victim, and where there is no other supporting testimony that Petitioner fired any shots at victim and trial counsel was ineffective in not objecting.

4. Trial and appellate counsel were ineffective in failing to investigate the ballistic evidence with a expert of his own where such evidence would have shown that the weapon attributed to him had not been fired at the victim.

5. Trial and appellate counsel were ineffective where counsel failed to seek suppression of Petitioner's involuntary and illegal custodial statement resulting from improper duress and unreasonably extended detention.

6. The evidence was insufficient to support a conviction of criminal conspiracy where no evidence, either direct or circumstantial, was produced of any agreement between Mr. Butler and Petitioner, or any other party, to commit a crime was adduced at trial.

7. The evidence was insufficient to suport a conviction of attempted homicide as there was no evidence of premeditation or deliberation as required for First Degree Homicide, which is the only degree of homicide that can support an attempted homicide conviction.

8. The trial court erred when it instructed the jury that it could find Petitioner guilty of Attempted Homicide if they found the Petitioner intended to commit the crime of Homicide.

9. The trial court erred in refusing to instruct the jury, when describing the crime of conspiracy as requested by defense, that the concept of guilt by association does not

exist in the law and this concept cannot be sufficient to support a conspiracy conviction.

10.     Trial counsel was ineffective on appeal, and Petitioner had a right to an attorney unassociated with the Public Defender's Office, and Petitioner is now forced to raise issues *pro se* because counsel failed to raise any issues.

11.     The trial court failed to give an accomplice theory instruction to the jury given the nature of the charges, or failed to give a corrupt source instruction.

Petition, ECF No. 4.

## B. Time Period for Filing Federal Habeas Corpus Petitions

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed under the one-year limitations period applicable to such petitions. In this regard, the federal habeas corpus laws impose a one-year limitations period applicable to state prisoners, which provides as follows.

(d)     (1)     A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of–

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-con-
        viction or other collateral review with respect to the pertinent
        judgment or claim is pending shall not be counted toward any period
        of limitation under this subsection.

28 U.S.C. § 2244(d) (as amended).

The Court of Appeals for the Third Circuit has held that the statute of limitations set out in

§ 2244(d)(1) must be applied on a claim-by-claim basis. <u>Fielder v. Varner</u>, 379 F.3d 113 (3d Cir.

2004), *cert denied*, 125 S.Ct.904 (Jan. 10, 2005). Thus, in analyzing whether a petition for writ of

habeas corpus has been timely filed under the one-year limitations period, a federal court must

undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual

claims raised in the Petition. Typically, this is the date that the petitioner's direct review concluded

and the judgment became "final" for purposes of triggering the one-year period under section §

2244(d)(1)(A). Second, the court must determine whether any "properly filed" applications for post-

conviction or collateral relief were pending during the limitations period that would toll the statute

pursuant to section 2244(d)(2). Third, the court must determine whether any of the other statutory

exceptions or equitable tolling should be applied on the facts presented.

In the instant action, the Supreme Court of Pennsylvania denied Petitioner's Petition for

Allowance of Appeal in his direct appeal on December 27, 2005. Consequently, direct review of

Petitioner's conviction became "final" on or about March 27, 2006, *i.e*, the date of the expiration of

the ninety-day period for filing a petition for writ of certiorari in the United States Supreme Court.

*See* <u>Swartz v. Meyers</u>, 204 F.3d 417, 419 (3d Cir. 2000) (noting that a judgment becomes final at

the conclusion of direct review or the expiration of time for seeking such review, including the time

limit (90 days) for filing a writ of certiorari in the Supreme Court; <u>Kapral v. United States</u>, 166 F.3d

565, 575 (3d Cir. 1999) (same for 28 U.S.C. § 2255 motions). Thus, Petitioner had one year from

that date, *i.e.*, until March 26, 2007 to file a federal habeas corpus petition challenging his conviction.

In the case at bar, however, Petitioner did not file his federal Habeas Petition by March 26, 2007; instead, his federal habeas corpus petition was not filed in this Court until November 16, 2008, the date he signed his Petition. Thus, this court must determine whether Petitioner can take advantage of the "tolling" provision in section 2244(d)(2). In this regard, as stated above, section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

With respect to the instant petition, Petitioner filed his PCRA petition on February 26, 2006, before his limitations period had even begun running. Therefore, his one-year limitations period began running on July 2, 2008, the day after his Petition for Allowance of Appeal from his PCRA proceeding was denied by the Supreme Court of Pennsylvania, and continued to run until July 1, 2009. As he filed his federal Petitioner on November 16, 2008, his Petition is timely filed.

### C. Standards Governing Federal Habeas Corpus Review

1.      Exhaustion Requirement

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state *habeas* proceedings, *mandamus* proceedings, or other available procedures for judicial review. *See, e.g.*, Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996). Moreover, a petitioner must present every

claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied. O'Sullivan v. Boerckel, 526 U.S. 838 (1999). The petitioner has the burden of establishing that exhaustion has been satisfied. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state petitioner's claims prior to exhaustion when no appropriate state remedy exists. Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995). A petitioner shall not be deemed to have exhausted state remedies, however, if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c).

An application for a writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

2.      Procedural Default Doctrine

Beyond questions of exhaustion, a federal court may be precluded from reviewing claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 678 (3d Cir. 1996). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman v. Thompson, 501 U.S. at 750.

A state's procedural rules are entitled to deference by federal courts; a petitioner's violation of a state procedural rule may constitute an independent and adequate state law ground for denial of federal review of habeas claims under the procedural default doctrine. *Id.*; Sistrunk, 96 F.3d at 673. Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his claims. Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996); Carter, 62 F.3d at 595. However, the procedural default doctrine only applies when a state procedural rule is consistently or regularly applied. Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997) (quoting Johnson v. Mississippi, 486 U.S. 578, 588-89 (1988)).[1] A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: 1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or 2) failure to consider the claims will result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Carter, 62 F.3d at 595.

Finally, the United States Court of Appeals for the Third Circuit has instructed that a petition containing exhausted and unexhausted but procedurally barred claims is not a mixed petition requiring dismissal under Rose v. Lundy, 455 U.S. 509 (1982). *See* Wenger v. Frank, 266 F.3d 218, 227 (3d Cir. 2001). Instead, the Court of Appeals held that the district court should review the merits of the exhausted claims but must not decide the merits of the claims that are barred under the procedural default doctrine. *Id.*

---

1. *See also* Doctor, 96 F.3d at 675 (the state rule must be firmly established and regularly followed before it can be considered an independent and adequate state law ground sufficient to foreclose federal court review under the procedural default doctrine).

3.    <u>Standard of Review for Exhausted (but not Procedurally Defaulted) Claims</u>

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir.2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Few state court decisions will be "contrary to" Supreme Court precedent. "Clearly established Federal law" should be determined as of the date of the relevant state-court decision. Greene v. Palakovich, Civil No. 07-2163, 2010 WL 2134575 (3d Cir. May 28, 2010).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular … case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. (quoting Williams, 529 U.S. at 407).

A recent decision of the Supreme Court illustrates the deference that the federal courts must accord to state court decisions. In Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855 (May 3, 2010), the Supreme Court reviewed the Court of Appeals for the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. The federal district court granted a writ of habeas corpus and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a

mistrial constituted an abuse of discretion because there was no manifest necessity. The Supreme

Court reversed.

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of ... clearly established Federal law." § 2254(d)(1).

Lett, 130 S.Ct. at 1862. The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision - or, for that matter, the trial judge's declaration of a mistrial - was right or wrong. The latter question, in particular, is a close one. As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial. The Michigan Supreme Court declined to accept this confession of error, People v. Lett, 463 Mich. 939, 620 N.W.2d 855 (2000), and in any event - for the reasons we have explained - **whether the trial judge was right or wrong is not the pertinent question under AEDPA.**

Id. at 1865, n. 3 (emphasis added).

Moreover, a federal court must accord a presumption of correctness to a state court's factual

findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e).

Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with

the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of

reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir.

2000). In determining what implicit factual findings a state court made in reaching a conclusion,

a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v.

Lonberger, 459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits

of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact.  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).  Petitioner's claims will be reviewed in accordance with the standards set forth above.

### D. Petitioner's Claims

1. Trial court committed reversible error and Petitioner was denied a fair trial where the court prohibited counsel from properly and fully impeaching the victim, Jamar Melvin, with his prior inconsistent preliminary testimony.

With respect to this claim, Petitioner points to two statements made by the victim during trial that were inconsistent with his testimony from the October 22, 2002 preliminary hearing.  First, at the preliminary hearing, the victim stated that he knew Petitioner because they had grown up together.  Second, he testified that during the first encounter with the car, Petitioner had been seated in the front passenger seat.  When asked if he saw Petitioner in the car when it approached the second time, the victim stated that he could not tell whether Petitioner was in the car and later stated that he never saw Petitioner at the time of the shooting.

With respect to the first statement, the victim testified at trial that he knew Petitioner but they did not grow up together.  Trial counsel then sought to impeach the victim by asking him about his testimony at the preliminary hearing.  When asked if he recalled testifying at the preliminary hearing that he and Petitioner grew up together, the victim replied, "I might have made that statement." (TT at 128).  The trial court, however, did not permit trial counsel to read the victim's testimony from the preliminary hearing transcript into the record.  (TT at 129-31).  With regard to the second statement, the victim testified that when he first saw the five men getting into the vehicle, he saw Petitioner in the front passenger seat.  He further testified that when the car came around a second time, he saw the same five people in the car and Petitioner was in the passenger side.  (TT at 100-01,

106).  Trial counsel again sought to impeach the victim with his preliminary hearing testimony.

When questioned about his prior testimony, the victim stated that he could not recall what he had

been asked or what he had said with regard to this issue.  Again, the trial court did not allow counsel

to read the prior testimony into the record.  Petitioner claims that the trial court erred in not allowing

his trial counsel to use the preliminary hearing transcript to impeach the victim.  *See, e.g.*,

Commonwealth v. Upchurch, 355 Pa. Super. 425, 435-436, 513 A.2d 995, 1000 (1986) (recognizing

that defense counsel had the opportunity to impeach the witness by cross-examination and through

the use of the preliminary hearing transcript); Commonwealth v. Lee, 244 Pa. Super. 460, 466, 368

A.2d 812, 815 (1976).

Petitioner raised this claim in his PCRA proceeding couched in terms of ineffectiveness of

counsel.  With respect to the first issue, the Pennsylvania Courts found that counsel had, in fact,

questioned the victim about whether he had previously stated that he grew up with Petitioner and

he admitted that he may have said that during the preliminary hearing.  Thus, the jury was aware of

the inconsistent statement.  Moreover, the Superior Court found that the inconsistency at issue, *i.e.*,

whether or not Petitioner and the victim grew up together, was merely a minor inconsistency and

the court's refusal to allow counsel to read the preliminary hearing transcript to impeach the victim

on this point could not have resulted in prejudice (ECF no. 14, Ex. 31, page 8, n.3).  With respect

to the second inconsistent statement, *e.g.*, that the victim stated in the preliminary hearing that he

did not see Petitioner in the car during the shooting, Petitioner could show no prejudice because in

his recorded confession, he admitted that at the time of the shooting he was located in the front

passenger seat of the car (ECF no. 14, Ex. 31, page 8).

A federal court must keep in mind the standard of review to be applied to allegations of trial

error.  In this regard, criminal defendants in this country are entitled to a fair, but not a perfect, trial.

"[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial," and the Constitution does not demand one. United States v. Hasting, 461 U.S. 499, 508 (1983) (internal citations omitted). This focus on fairness, rather than on perfection, protects society from individuals who have been duly and fairly convicted of crimes, thereby promoting "public respect for the criminal process." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

With this in mind, the Supreme Court developed what is known as the "harmless error" rule. In Brecht v. Abrahamson, 507 U.S. 619 (1993), the Supreme Court set forth the standard for harmless error in habeas cases involving constitutional trial flaws. In Brecht, the Supreme Court held that habeas relief is available only where the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). To meet this standard, there must be more than the "reasonable possibility" that the error contributed to the jury's determination of guilt. Brecht, 507 U.S. at 637. See also Fry v. Pliler, 551 U.S. 112 (2007). When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. O'Neal v. McAninch, 513 U.S. 432, 436 (1995).

Petitioner has failed to demonstrate that the decisions of the Pennsylvania courts regarding the victim's prior inconsistent statements were clearly contrary to federal law or an unreasonable application of federal law. Nor has he shown that the trial court's refusal to allow trial counsel to use the preliminary hearing transcript to impeach the victim had a "substantial and injurious effect or influence" on the jury's verdict. Consequently, Petitioner is not entitled to habeas corpus relief as to this claim.

Also in Petitioner's first claim is his allegation that the court prejudiced the defense when it belittled counsel in front of the jury. Specifically, Petitioner takes issue with the trial court's comments that defense counsel was not doing it right and was not doing it correctly in regards to impeaching the victim's testimony with the preliminary hearing transcript. In its review of this claim, the Superior Court of Pennsylvania held as follows.

> The second issue raised is whether the trial court improperly interfered with trial counsel's attempt to impeach the victim with his preliminary hearing testimony, thereby belittling counsel in the eyes of the jury. Every unwise or irrelevant remark made in the course of the trial by a judge, does not compel the granting of a new trial. A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.
>
> . . .
>
> We agree [] that a trial judge should use only such language as is essential to the requirements of the situation and should not unnecessarily belittle counsel's argument or cast unwarranted reproaches on him. However, having reviewed the trial court's remarks, we find they were a proper method of exercising the court's authority over the admission of evidence and that the language used to convey to counsel the court's concerns about the questions was not improperly belittling. Therefore, the remarks were not prejudicial so as to deny Appellant a fair trial. Accordingly, Appellant is not entitled to a new trial on this basis.

ECF No. 13-6, pp. 37-39 (internal citations omitted).

Petitioner has failed to demonstrate that the Superior Court's decision was clearly contrary to federal law or an unreasonable application of federal law. Nor has he shown that the trial court's comments had a "substantial and injurious effect or influence" on the jury's verdict. Consequently, Petitioner is not entitled to habeas corpus relief as to this claim.

2. Petitioner was denied a fair trial where trial court improperly restricted and curtailed defense counsel's closing argument when it limited defense counsel from arguing the significance of the victim's prior inconsistent statements and when it *sua sponte*

prohibited defense counsel from fully and fairly arguing the concept of reasonable doubt.

Petitioner raised this claim in his PCRA proceeding; however, the Superior Court declined to rule on the merits of this claim finding it had been waived because Petitioner could have raised it, but failed to do so before trial, at trial, or on appeal (ECF No. 14-5, p. 4, n.2). The following discussion reveals that Petitioner has procedurally defaulted this claim by failing to properly present it to the Pennsylvania courts in accordance with applicable Pennsylvania law.

In this respect, in order to comply with the exhaustion requirement in 28 U.S.C. § 2254, Petitioner was required to present all of his federal habeas claims to the Pennsylvania courts in his direct appeal or in his PCRA proceeding. Because he failed to do so, this Court must determine whether Petitioner has any other available state court remedy through which he can present his unexhausted claims to the Pennsylvania courts. Under Pennsylvania law, the exclusive remedy to challenge a conviction following direct appeal is through a PCRA proceeding brought in accordance with the Post Conviction Relief Act. *See* 42 Pa. Cons. Stat. § 9542. Under the PCRA, a petitioner may bring a second PCRA petition only as provided for in the PCRA, as set forth below.

> (b)     Time for filing petition.--
>
> (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
>> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>>
>> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.

(4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.

42 Pa. Cons. Stat. § 9545(b).  The Supreme Court of Pennsylvania has held that the PCRA's timeliness requirements are mandatory and jurisdictional in nature; thus, no court may properly disregard or alter them in order to reach the merits of the claims raised in a PCRA petition that is filed in an untimely manner.  *See, e.g.*, Commonwealth v. Murray, 562 Pa. 1, 5, 753 A.2d 201, 202-203 (2000); Commonwealth v. Fahy, 558 Pa. 313, 328-29, 737 A.2d 214, 222 (1999); Commonwealth v. Peterkin, 554 Pa. 547, 722 A.2d 638, 641 (1998).

Under Pennsylvania law, the only potential state remedy that Petitioner may pursue to raise his unexhausted claim is a second PCRA petition.  In order for him to be able to file a second PCRA now, he must allege facts that show that:  1) the failure to raise the claim previously was the result of interference by government officials; 2) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or 3) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.  42 Pa. Cons. Stat. § 9545(b)(1).  Petitioner's habeas

petition does not allege any of the three exceptions listed above. Consequently, he is precluded from presenting his unexhausted claim in a second PCRA petition based on the time limitations set forth in the PCRA. These time limitations are an independent and adequate state law ground sufficient to invoke the procedural default doctrine for purposes of federal court review. Lines v. Larkin, 208 F.3d 153, 165 (3d Cir. 2000).

As stated previously, this federal court may not review Petitioner's defaulted claim unless he demonstrates cause and prejudice for his default or establishes a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000). To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. at 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." Carrier, 477 U.S. at 494.

In order to establish prejudice to excuse a procedural default, a petitioner has to convince the federal court that there is a "reasonable probability," not a mere possibility, that the result of the trial would have been different if the evidence at issue had been disclosed to the jury. Strickler v. Greene, 527 U.S. 263, 289 (1999). " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " Id. at 289-90 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). In other words, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Id. at 290 (internal quotation omitted). It is the defendant's burden to establish a reasonable probability of a different result. Id. at 291 (emphasis deleted).

Employing the prejudice test set forth above, it is clear that the Petitioner has failed to establish the prejudice required to overcome his procedural default. As stated above, Petitioner admitted that he was in the in the car during his recorded statement, which was played for the jury. Thus, he can show no prejudice with respect to his claim.

Finally, Petitioner also has not demonstrated that a fundamental miscarriage of justice will result from the failure of this Court to review his claim. In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court explained the narrow class of cases implicating a fundamental miscarriage of justice. Specifically, the Court defined the miscarriage of justice exception by holding that a habeas petitioner is required to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id*. at 327 (quoting Murray v. Carrier, 477 U.S. at 496). The Court instructed that "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Id. at 324. The Court further explained that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id*. at 327.

The federal courts, including the Court of Appeals for the Third Circuit, are in agreement that, in order to show a fundamental miscarriage of justice under the Schlup standard, a petitioner must offer new or reliable evidence in support of his claim of factual innocence. *See, e.g.*, Keller v. Larkins, 251 F.3d 408, 415-16 (3d Cir. 2001) ("To show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime by presenting new evidence of

innocence.") (citations omitted).  Petitioner has failed to meet his burden in this regard.

Consequently, he is not entitled to habeas corpus relief with respect to his second claim.

3.  Petitioner's constitutional rights to confrontation, due process, and fair trial were unfairly violated, and violated under <u>Bruton</u> by admission into evidence of an improperly redacted and highly prejudicial hearsay statement of non-testifying co-defendant who claimed that another person who was obviously not Petitioner had fired a handgun at the victim, and where there is no other supporting testimony that Petitioner fired any shots at victim and trial counsel was ineffective in not objecting.

This claim involves testimony from witness Officer Garlicki regarding statements made by

Petitioner's co-defendant Anger, who elected not to testify during the joint trial.  In relating Anger's

statement to the jury during trial, Officer Garlicki testified that Anger stated that he was driving the

car and there was another person in the passenger seat and that in the rear seat of the car was Blake

Smith, Greg Hood and a guy called Tone Tone Phil.  Anger further stated that as they pulled up the

second time, he thought he saw Will Sutton go to his waistband, and he thought Melvin, the victim,

went to his waistband also.  He said that the passenger in his vehicle then opened fire, shooting it

across at the victim and Will Sutton.  He said when the passenger began firing, he took the firearm

he had and he also began firing.  At the end of the testimony, the trial court provided a cautionary

instruction to the jury that statements made before trial may be considered as evidence only against

the defendant who made that statement.  Specifically, the trial court instructed the jurors that they

may not consider the statement as evidence against the other defendant.  (TT at 406-407).

This claim invokes Petitioner's rights under the confrontation clause of the Sixth

Amendment were violated.  An accused's Sixth Amendment right "to be confronted with the

witnesses against him" is "incorporated into the Fourteenth Amendment and therefore available in

state proceedings." <u>Olden v. Kentucky</u>, 488 U.S. 227, 231 (1988).  The right of cross-examination

is included in the right of an accused in a criminal case to confront the witnesses against him.

Pointer v. State of Texas, 380 U.S. 400, 406-407 (1965) (holding that a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him).

In Douglas v. State of Alabama, 380 U.S. 415 (1965), the Supreme Court found that a defendant's confrontation rights were violated when the prosecution testified as to statements made by a co-defendant who inculpated the defendant in the crime. Specifically, the Court determined that the defendant's inability to cross-examine the co-defendant denied him the right of cross-examination secured by the Confrontation Clause. *Id*. at 419.

The court was confronted with a similar issue in Bruton v. United States, 391 U.S. 123 (1968). Bruton involved two defendants accused of participating in the same crime and tried jointly before the same jury. One of the defendants had confessed and his confession named and incriminated the other defendant. The trial judge issued a limiting instruction, telling the jury that it should consider the confession as evidence only against the codefendant who had confessed and not against the defendant named in the confession. Bruton held that, despite the limiting instruction, admitting one defendant's confession without giving the other defendant the opportunity to cross-examine him violated the Confrontation Clause of the Sixth Amendment

> Here the introduction of [co-defendant's] confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Bruton, 391 U.S. at 137.

The Court confronted a similar issue in <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), which involved a joint murder trial of Marsh and Williams.  In that case, the State introduced a confession given by Williams to the police shortly after his arrest. The confession was redacted to omit all reference to Marsh and omitted all indications that anyone other than Williams and a third person had participated in the crime.  As redacted, the confession indicated that Williams and the third person had discussed the murder in the front seat of a car while they traveled to the victim's house; it contained no indication that Marsh-or any other person-was in the car.  At the time the confession was admitted, the jury was instructed not to use it in any way against Marsh. Williams did not testify.  The Supreme Court held that this redacted confession fell outside <u>Bruton</u>'s scope and was admissible (with appropriate limiting instructions) at the joint trial.

> We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

<u>Marsh</u>, 481 U.S. at 211.

A decade later the Court decided <u>Gray v. Maryland</u>, 523 U.S. 185 (1998).  In <u>Gray</u>, the prosecution redacted the co-defendant's confession by substituting for the defendant's name in the confession a blank space or the word "deleted." Consequently, the police detective who read the confession into evidence said the word "deleted" or "deletion" whenever Gray's name appeared. The State also introduced into evidence a written copy of the confession with the name omitted, leaving only a blank space.  The Supreme Court held that this redaction was inadequate to protect the non-declarant defendant's Sixth Amendment rights. The basic problem with such obvious alterations, the Court explained, is that typically they will not likely fool anyone and a juror immediately would know whose name has been removed.  *Id*. at 193.

Thus, the clearly established federal law is as follows. A defendant's extrajudicial statement may be admitted in evidence in a joint trial, with an appropriate limiting instruction, if the statement, as redacted, does not incriminate a non-declarant co-defendant on its face, either explicitly or by direct and obvious implication.

In Petitioner's case, trial counsel filed an Omnibus Pre-Trial Motion requesting that any statement in Anger's confession referring to Petitioner be redacted and that a neutral phrase such as "another person" or "another man" replace Petitioner's name. The court permitted this redaction and all references to Petitioner in Anger's confession were omitted; he was referred to only as "another person" or as "the passenger." (TT at 9, 250-251). In its review of this claim, the PCRA court held that Petitioner's right to confront witnesses was not violated when police testified regarding inculpatory statements made by Anger because the confession was redacted and Defendant's name was not used (ECF no. 14, Ex. 28, p. 3). In light of the discussion above, the Court finds that the PCRA Court's conclusion was not unreasonable. *Accord* Greene v. Palakovich, 606 F.3d 85 (3d Cir. 2010).

Moreover, even assuming that Petitioner's confrontation rights were violated, a holding the Court specifically does not make, such error would have been harmless in light of the overwhelming evidence of Petitioner's guilt. *See* Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008) (holding that any error in presenting redacted version of co-defendant's confession, in the absence of co-defendant's testimony, was harmless); Sanders v. Klem 341 Fed. App'x 839, 843 (3d Cir. 2009) (same). Petitioner asserts that the admission of Anger's statement caused him prejudice because there was no other supporting testimony that Petitioner fired any shots at the victim. But Petitioner's argument is belied, first and foremost, by his own statements to the police that he fired several shots in the air before fleeing the scene and disposing of his gun. In addition, there was significant

ballistics evidence linking Petitioner's gun to the shootings.  On this record, I am confident that the admission of Anger's statement did not have a substantial and injurious effect or influence in determining the jury's verdict.  Consequently, Petitioner is not entitled to habeas relief as to this claim.

Petitioner also asserts that his trial counsel was ineffective for failing to object to Anger's confession being admitted into evidence.  The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:   1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct.  Strickland, 466 U.S. at 690.  A petitioner who claims that he or she was denied effective assistance of counsel carries the burden of proof.  United States v. Cronic, 466 U.S. 648, 658 (1984).

The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689.  The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place.  Id.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694 (emphasis added). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id.

In Kimmelman v. Morrison, 477 U.S. 365 (1986), the Court determined that a habeas petitioner could raise a claim of ineffective assistance when his trial counsel failed to file a timely pre-trial motion to suppress evidence allegedly obtained in violation of the Fourth Amendment. Notwithstanding, the Court instructed that the mere failure to file a timely suppression motion does not constitute per se ineffective representation. Kimmelman, 477 U.S. at 383. To demonstrate actual prejudice under the second prong of the Strickland test, a petitioner must prove that the Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence. Kimmelman, 477 U.S. at 375.

For the same reasons stated above, I find that counsel did not render ineffective assistance for failing to file a motion to suppress Anger's confession. First, in light of the discussion above, it does not appear that the trial court would have granted such motion had it been filed. See United States v. Sanders, 165 F.3d 248, 253-254 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.") Second, due to the overwhelming evidence against him, including his own confession and the ballistics evidence,[2] I can not find that there is a reasonable probability that the verdict would have

_____

2. The gun found on Petitioner was identified as an Astra model A-80 9 millimeter handgun (TT at 205-206). Petitioner's gun matched that of several bullet casings found at the scene, indicating

been different absent the excludable evidence. Consequently, Petitioner is not entitled to habeas relief on this claim.

4.     Trial and appellate counsel were ineffective in failing to investigate the ballistic evidence with a expert of his own where such evidence would have shown that the weapon attributed to him had not been fired at the victim.

Petitioner raised this claim in his PCRA proceeding where the Superior Court found that trial counsel was not ineffective for failing to introduce forensic expert testimony.

> In his fourth issue, [Petitioner] argues that trial counsel was ineffective for failing to secure a ballistics expert to testify at trial. Likewise, [Petitioner] contends that appellate counsel was ineffective for failing to raise this issue. Once again, we disagree.
>
> In order to prevail on a claim that trial counsel was ineffective for failing to call a witness, an appellant must identify a specific witness who was available and willing to testify at trial. In the case *sub judice*, Appellant has not identified any expert witness who would testify now on behalf of Appellant concerning ballistic evidence, much less an expert who was available and willing to testify at trial. Therefore, we conclude that Appellant's fourth issue on appeal must fail.

ECF No. 14-5, p. 8 (internal citations omitted).

Petitioner has the burden of setting forth sufficient facts to support each claim. Petitioner fails to specify what expert witness would have testified and what that expert witness would have testified to. Making a bald assertion that some expert witness would have testified that Petitioner's weapon did not discharge the bullets that struck a vital part of the victim's body is speculative at best. "[Petitioner] must establish a reasonable probability – one sufficient to undermine our confidence in the outcome – that the jury's verdict would have been different if not for counsel's errors. Such a showing may not be based on mere speculation about what the witnesses [defendant]

---

that the weapon had been fired and the bullets came from Petitioner's weapon (TT at 219-221).

failed to locate might have said." United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989) (quotations omitted) (internal citation omitted); *see also* Duncan v. Morton, 256 F.3d 189, 201-202 (3d. Cir. 2001). Bald assertions and conclusory allegations do not afford a sufficient ground to provide habeas relief. Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 & n. 12 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991); Mayberry v. Petsock, 821 F.2d 179, 185 (3d Cir.), *cert. denied*, 484 U.S. 946 (1987). Consequently, Petitioner has not shown that he is entitled to habeas relief with respect to this claim.

5.  Trial and appellate counsel were ineffective where counsel failed to seek suppression of Petitioner's involuntary and illegal custodial statement resulting from improper duress and unreasonably extended detention.

In support of this claim, Petitioner states that he was detained from approximately 2:30 a.m. to 6:30 a.m., not informed how long his detention would continue, and continually questioned by police officers. He was made to believe that he would not leave police custody until he gave a statement and was not permitted to consult with family members. He claims that the ensuing statement following his lengthy detention and interrogation resulted from improper duress and unlawful coercion. Therefore, Petitioner asserts that prior counsels were ineffective for failing to move to suppress this unlawfully obtained statement.

In essence, Petitioner asserts that his confession should have been suppressed because it was involuntary. There are two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. Dickerson v. United States, 530 U.S. 428, 433 (2000). In Miranda v. Arizona, 384 U.S. 436, 467 (1966), the Supreme Court determined that custodial police interrogation inherently involved "compelled" testimony for purposes of the Fifth Amendment. To combat this inherent compulsion, the Supreme Court imposed an obligation on the

police to follow certain procedures when dealing with persons accused of criminal conduct. These procedures, referred to as "Miranda" warnings, require the police, *prior* to the initiation of questioning, to inform the accused of the right to remain silent, the right to have an attorney present, that the accused is suspected of involvement in criminal activity and that any statement made by the accused may be used by the police as evidence against him. *Id*. at 468-470. The Miranda rule further requires the police to respect an accused's decision to exercise the rights protected by the Miranda warnings and cease interrogation if the accused indicates that he wishes to remain silent or if he states that he wants an attorney. *Id*. at 473-474. Failure to honor such a request results in suppression of statements made by an accused after he has made such a request. Oregon v. Elstad, 470 U.S. 298, 307 (1985) (the failure to administer Miranda warnings creates an irrebuttable presumption of compulsion that prohibits the prosecution from using such statements in its case in chief, even with respect to statements that are otherwise voluntary within the meaning of the Fifth Amendment).

> . . . Miranda holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal quotations and citations omitted).

Thus, in determining whether a confession was voluntary, a court must determine whether the confession was "the product of an essentially free and unconstrained choice by its maker," that

it was "the product of a rational intellect and a free will" and that the appellant's will was not "overborne." United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotations and citations omitted). Courts look to the totality of circumstances to determine whether a confession was voluntary, including: the length of the interrogation; its location; its continuity; the defendant's maturity; physical condition; and mental health. *Id*. (citations omitted). The Court should consider all of these factors to determine whether the circumstances show that the conduct of law enforcement officials was such as to overbear the defendant's will to resist. Rogers v. Richmond, 365 U.S. 534, 544 (1961).

Petitioner raised this claim in terms of ineffective assistance in his PCRA proceeding. Both the PCRA court and the Superior Court of Pennsylvania found that Petitioner was unable to establish that his prior counsel was ineffective for failing to pursue a suppression motion at trial. Specifically, the PCRA Court held as follows.

> Counsel was likewise not ineffective in failing to seek suppression of Defendant's custodial statement. After being informed of his rights, the Defendant first denied having either knowledge or involvement in the shooting. (T.T. 214) This denial was again asserted during a later interview. (T.T. 215) During a third interview, the Defendant was told that the ballistics of the firearm he was found with matched evidence at the scene. (T.T. 220) It was at that time that the Defendant admitted his involvement. Then the Defendant gave a taped statement and stated on the tape that he was not coerced in making his confession. (T.T. 225, 240) Trial counsel had no basis to ask for the suppression of the Defendant's statement.

ECF No. 14, Ex. 28, p. 4).

The Superior Court affirmed the decision of the PCRA court.

> In his final issue, Appellant asserts that prior counsel were ineffective for failure to pursue the claim that Appellant's taped statement should have been suppressed due to its having been obtained while Appellant was under duress. Specifically, Appellant

asserts that because he was in police custody for approximately five hours, his recorded statement was involuntary. We cannot agree.

In order to prove that a confession was not voluntary, the accused must demonstrate that the interrogation which led to the confession was so coercive that he or she was prevented from having the ability to make a free and unconstrained decision to confess. Further, the factors to be considered in the determination of whether a confession was voluntary include the psychological state of the accused, the conditions of his or her detention, and the attitude exhibited by the interrogators.

In the case *sub judice*, Appellant fails to identify any elements of coercion other than the length of time Appellant was in custody prior to his making the statements. Furthermore, a review of the record reveals that Appellant affirmatively waived his rights at least three times during the course of his interviews. Indeed, Appellant indicated, during his taped statement, that his confession was not coerced. Therefore, we conclude that prior counsel were not ineffective for failing to pursue a suppression claim regarding Appellant recorded statement because such claim would have lacked arguable merit. Therefore, Appellant's last issue on appeal must also fail.

ECF No. 14, Ex. 31, pp. 9-10.

The effectiveness of a defendant's waiver of Miranda rights is a mixed question of law and fact. Ahmad v. Redman, 782 F.2d 409, 413 (3d Cir. 1986), *cert denied*, 479 U.S. 831 (1986). The trial court determined that Petitioner was informed of his rights and that he was not coerced with respect to the waiver of his Miranda rights. These factual determinations, which are supported by the record, are entitled to the presumption of correctness provided by 28 U.S.C. § 2254(d). Cardwell v. Taylor, 461 U.S. 571, 573 (1983); Alson v. Redman, 34 F.3d 1237, 1253 (3d Cir. 1994), *cert. denied*, 513 U.S. 1160 (1995). Petitioner has failed to set forth any evidence to overcome the presumption of correctness. *Cf.* Miller v. Fenton, 796 F.2d 598, 614 (3d Cir. 1986), *cert. denied*, 479 U.S. 989 (1986) (although the government has the burden to establish the voluntariness of a

confession before it can be introduced at trial, following conviction, the burden shifts to the defendant to prove involuntariness).

Moreover, the record is devoid of any suggestion that the police resorted to physical or psychological pressure to elicit Petitioner's statements. The trial court concluded that the totality of the circumstances supported the Commonwealth's assertion that Petitioner had voluntarily, knowingly and intelligently waived his Fifth Amendment rights. The Superior Court agreed with the trial court's determination. Petitioner has not demonstrated that this determination is contrary to, or an unreasonable application of, clearly established federal law. *See* United States v. Sriyuth, 98 F.3d 739, 750 (3d Cir. 1996) (Miranda waiver deemed voluntary) *cert. denied*, 519 U.S. 1141 (1997); Alson, 34 F.3d at 1253 (same).

It follows, then, that counsel cannot be deemed to have been ineffective for failing to have filed a suppression motion. Accordingly, Petitioner is not entitled to habeas corpus relief with respect to this claim.

6. The evidence was insufficient to support a conviction of criminal conspiracy where no evidence, either direct or circumstantial, was produced at trial of any agreement to commit a crime.

Where a petitioner challenges his incarceration on the ground that the evidence was insufficient to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under this standard, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. *Accord* Moore v. Deputy Commissioner(s) of

SCI-Huntington, 946 F.2d 236, 243 (3d Cir. 1991), *cert. denied*, 503 U.S. 949 (1992).  A federal

court must apply this standard " 'with explicit reference to the substantive elements of the criminal

offense as defined by state law.' " Orban v. Vaughn, 123 F.3d 727, 731 (3d Cir. 1977)  (quoting

Jackson, 443 U.S. at 324 n. 16), *cert. denied*, 522 U.S. 1059 (1988).  *See also* Jackson v. Byrd, 105

F.3d 145, 149 (3d Cir.) (federal habeas courts look to the evidence the state considers adequate to

meet the elements of a crime governed by state law), *cert. denied*, 520 U.S. 1268 (1997).  The jury,

however, weighs the evidence and the federal courts must defer to the jury's resolution of conflicts

in the evidence.  Jackson, 443 U.S. at 326.  Moreover, when a state appellate court thoroughly

reviews the sufficiency of evidence, that court's determination is entitled to great weight.  Parke v.

Raley, 506 U.S. 20, 36 (1993).  This deferential test places a very heavy burden on the appellant.

United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).

     The test for insufficiency of evidence is the same under both Pennsylvania and federal law.

*See* Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir. 1992), *cert.*

*denied*, 506 U.S. 1089 (1993); Commonwealth v. Bricker, 525 Pa. 362, 581 A.2d 147 (1990) (an

appellate court must determine whether the evidence, and all reasonable inferences deducible

therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient

to establish all of the elements of the offenses charged).

     Under Pennsylvania law, a criminal conspiracy is defined as follows.

          (a) Definition of conspiracy.--A person is guilty of conspiracy with
          another person or persons to commit a crime if with the intent of
          promoting or facilitating its commission he:

               (1) agrees with such other person or persons that they
               or one or more of them will engage in conduct which
               constitutes such crime or an attempt or solicitation to
               commit such crime; or

(2) agrees to aid such other person or persons in the
planning or commission of such crime or of an
attempt or solicitation to commit such crime.

18 Pa. Cons. Stat. § 903.

Petitioner raised this claim on direct appeal where the Superior Court held as follows.

> Appellant first argues that the evidence was insufficient to
> support his conviction for criminal conspiracy. A conspiracy
> conviction requires proof of: 1) an intent to commit or aid in an
> unlawful act; 2) an agreement with a co-conspirator; and 3) an overt
> act in furtherance of the conspiracy. Because an explicit or formal
> agreement to commit a crime is often difficult to prove, it may be
> inferred where it is demonstrated that the relation, conduct, or
> circumstances of the parties, and the overt acts of the co-conspirators
> sufficiently prove the formation of a criminal confederation. The
> conduct of the parties and the circumstances surrounding their
> conduct may create a web of evidence linking the accused to the
> alleged conspiracy beyond a reasonable doubt. Appellant argues that
> there was no agreement between Appellant and co-Defendant.

> There was ample evidence from which the jury could have
> inferred an agreement. Viewing the facts in the light most favorable
> to the Commonwealth, Appellant and his co-Defendant shot from the
> same vehicle at the same time, which suggests a concerted action.
> They approached the victim once, and then circled the block and
> returned, asked a question, and quickly began firing. This sequence
> of events suggests ample time for and the likelihood of the
> formulation of a plan and agreement to commit the crime. Therefore,
> we find sufficient evidence that a reasonable jury could have found
> that Appellant's conduct met the requirements for criminal
> conspiracy.

ECF No. 13-6, pp. 35-36 (internal quotations and citations omitted).

Petitioner has not demonstrated that the Superior Court's determination is contrary to, or an

unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled

to habeas corpus relief from this federal court with respect to his sixth claim.

7.      The evidence was insufficient to support a conviction of attempted homicide as there
        was no evidence of premeditation or deliberation as required for First Degree

Homicide, which is the only degree of homicide that can support an attempted homicide conviction.

Petitioner raised this claim on direct appeal to the Superior Court where he argued that there was insufficient evidence to establish the requisite intent to support his attempted homicide conviction. Specifically, he alleged that the Commonwealth failed to prove that he possessed the requisite intent to kill. Without evidence of this necessary element, Petitioner claims that he should not have been convicted of attempted murder.

Under Pennsylvania law, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa. Cons. Stat. § 901(a). "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa. Cons. Stat. § 2501(a). "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa. Cons. Stat. § 2502(a). Thus, to sustain an attempted homicide conviction in Pennsylvania, there must be proof that the actor took a substantial step toward the commission of a killing with the specific intent to kill. Commonwealth v. Geathers, 847 A.2d 730, 734 (Pa. Super. 2004); Commonwealth v. Anderson, 538 Pa. 574, 650 A.2d 20, 24 (1994) (holding that the Commonwealth must establish specific intent to kill for a defendant to be found guilty of attempted murder). The issue as to whether the defendant had the specific intent to kill can be inferred from the surrounding circumstances of the killing. In particular, the finder of fact in a prosecution for first-degree murder may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body. Commonwealth v. Blakeney, 946 A.2d 645, 596 Pa. 510 (2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 1317 (2009).

Petitioner raised this claim on direct appeal where the Superior Court held as follows.

Despite Appellant's bald assertion to the contrary, there was sufficient evidence of his intent to kill. Viewing the facts and reasonably deducible inferences therefrom in the light most favorable to the Commonwealth, Appellant and/or his co-conspirator shot directly at the victim, who was hit, among other places, in the chest. Therefore, a reasonable jury could have inferred that at least one of the co-conspirators intended to kill the victim from the use of a deadly weapon on a vital part of the victim's body. All members of a conspiracy are responsible for the acts of the co-conspirator committed in furtherance of the conspiracy.

ECF No. 13-6, pp. 36-37.

Petitioner has not demonstrated that the Superior Court's determination is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas corpus relief from this federal court with respect to his seventh claim.

8.     The trial court erred when it instructed the jury that it could find Petitioner guilty of Attempted Homicide if they found the Petitioner intended to commit the crime of Homicide.

Specifically, Petitioner states that the trial court erred in instructing the jury that they could find the defendant guilty of attempted homicide if they found that the defendant intended to commit the crime of homicide and did not charge the jury in accordance with Pennsylvania law, which provides that the Commonwealth must prove that the defendant attempted to commit first degree murder in order to convict for attempted homicide.

The individual states define the elements of state offenses. Patterson v. New York, 432 U.S. 197, 201 (1977) ("It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government . . . and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States"). Cf. Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) ("[i]t is axiomatic that Pennsylvania may, within certain constitutional limits, define first-degree murder in whatever way the

Commonwealth sees fit").  A federal court is bound by a state court's construction of a state statute.

Wisconsin v. Mitchell, 508 U.S. 476 (1993).  *See also* Schad v. Arizona, 501 U.S. 624, 636 (1991)

(federal courts are not free to substitute their own interpretations of state statutes for those of a

State's courts); Mulanney v. Wilber, 421 U.S. 684 (1975) (exceptional circumstances being absent,

United States Supreme Court accepted, as binding, the Maine Supreme Judicial Court's construction

of its state homicide law).

Notwithstanding, the federal Constitution imposes constraints upon the state's authority to

convict a person of state defined criminal offenses.  In this regard, it is well-settled that "the Due

Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

charged." In re Winship, 397 U.S. 358, 364 (1970).  Thus, a jury instruction that omits or materially

misdescribes an essential element of an offense as defined by state law relieves the state of its

obligation to prove facts constituting every element of the offense beyond a reasonable doubt,

thereby violating the defendant's federal due process rights.  Smith v. Horn, 120 F.3d 400, 415 (3d

Cir. 1997) (citing Carella v. California, 491 U.S. 263, 265 (1989) (*per curiam*), *cert. denied*, District

Attorney of Bucks County v. Smith, 522 U.S. 1109 (1998).

Notwithstanding, the mere fact that an instruction was allegedly incorrect under state law is

not a basis for habeas relief.  Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983).  The question

is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973).  It is well established that the

instruction may not be judged in artificial isolation, but must be considered in the context of the

instructions as a whole and the trial record.  *Id*. at 147 (internal citations omitted).  In reviewing an

ambiguous instruction, the court must inquire whether there is a reasonable likelihood that the jury

has applied the challenged instruction in a way that violates the Constitution. <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990). Moreover, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. *See* <u>Calderon v. Coleman</u>, 525 U.S. 141, 146-47 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting relief in habeas proceedings. *Id.*

In Petitioner's case, the trial court's instructions read as follows.

> For purposes of this case, the crime of homicide, the crime which the defendant is charged with having attempted, may be defined as follows: A person who illegally takes the life of another person is guilty of the crime of homicide. In order to find the defendant guilty of attempted homicide you must be satisfied that the following three elements have been proven beyond a reasonable doubt:

> First, that the defendant did a certain act, that is, he shot or shot at Jamar Melvin; second, that the defendant did the act with intent to commit the crime of homicide; and third, that the act constituted a substantial step toward the commission of the crime.

> A person intends to commit the crime of homicide if it is his purpose to illegally take the life of another person.

> A person cannot be guilty of an attempt to commit a crime unless he has a firm intent to commit that crime. If he has not definitely made up his mind, if his purpose is uncertain or wavering, he lacks the kind of intent with is required for attempt.

> As I've told you, one of the elements of this crime is that the defendant intended to commit the crime of homicide. Ordinarily, it is not possible to prove intent by direct evidence unless, for example, there is evidence that the defendant made a statement concerning his state of mind.

> However, intent, like any other matter, may be proved by circumstantial evidence, that is, by inferences that reasonably may be drawn from all the facts and circumstances, including the defendant's acts and conduct, which have been shown by the evidence in the case.

TT, pp. 393-94.

In reviewing this claim on direct appeal, the Superior Court held as follows.

> Although the trial court did not use the exact phrase "specific intent to kill," we find it properly conveyed the law by instructing the jury the crime required Appellant acted with the "purpose to illegally take the life of another person." See <u>Commonwealth v. Thompson</u>, 674 A.2d 217, 223 (Pa. 1996) (holding trial court not required to use "magic words" or deliver charge within prescribed pattern). Further, we note the trial court's instruction was similar to an instruction the <u>Geathers</u> Court approved, which stated, "A person 'intends' to commit the crime of murder if he intends to take the life of another human being." <u>Geathers</u>, 847 A.2d at 736, n.1. Considering the wide discretion afforded a trial court in phrasing jury instructions and the lack of error in the trial court's instructions, Appellant is not entitled a new trial on this basis.

ECF No. 13-6, p. 41.

Petitioner has failed to establish that the state court's decision was clearly contrary to federal law or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Moreover, he has failed to establish how the Pennsylvania Superior Court, in analyzing this claim, applied the law in an "objectively unreasonable manner." <u>Bell v. Cone</u>, 535 U.S. 685, 698-699 (2002). Thus, Petitioner is not entitled to habeas relief with respect to his eighth claim.

9.     The trial court erred in refusing to instruct the jury, when describing the crime of conspiracy as requested by defense, that the concept of guilt by association does not exist in the law and this concept cannot be sufficient to support a conspiracy conviction.

Petitioner alleges that the trial court erred when it did not adopt the language requested by his counsel. My issue on review, is whether the ailing instructions by themselves so infected the entire trial that the resulting conviction violates due process, not simply whether the instruction is "undesirable, erroneous, or even 'universally condemned. <u>Estelle v. McGuire</u>, 502 U.S. 62, 72

(1991). *Cf.* <u>Commonwealth v. Watley</u>, 548 Pa. 574, 699 A.2d 1240, 1245-46 (1997) ("the mere fact that a defendant may believe that further explanation would have been beneficial does not render a charge defective.").

The trial court charged the jury with the following conspiracy instruction.

The defendant is charged with conspiracy criminal conspiracy. Again, these will be applied to each person separately.

The defendant is charged with conspiracy to commit homicide and/or aggravated assault causing serious bodily injury and/or aggravated assault with a deadly weapon. In general terms, a conspiracy is an agreement between two or more persons to commit a crime. Their agreement constitutes the conspiracy. They have conspired even if they never do commit the agreed crime.

The form of the conspirator's agreement is not important. It may be an express, verbal agreement or it may be a largely unspoken, common understanding. If the conspirators know how each other thinks, they may be able to communicate their agreement by their behavior, without a lot of words.

Their agreement does not have to cover the details of how the crime will be committed, nor does it have to call for all of them to participate in actually committing the crime. They can agree that one of them will do the job. What is necessary is that the parties do agree, in other words, do come to a firm common understanding that the crime will be committed.

Although the agreement itself is the essence of the conspiracy, a defendant cannot be convicted of conspiracy unless he or a fellow conspirator does something more, does an overt act in furtherance of the conspiracy.

The overt act is an act by any conspirator which shows that the parties have a firm agreement, and are not just thinking or talking about committing a crime. The overt act shows that the conspiracy has reached the action stage.

If a conspirator actually commits or attempts to commit the agreed crime, that obviously would be an overt act in furtherance of the conspiracy. But a small act or step that is much more preliminary and a lot less significant can satisfy the overt act requirement.

The information alleges that the defendants conspired one with the other. The Information alleges that the crime of homicide and/or aggravated assault, serious bodily injury, and/or aggravated assault with a deadly weapon, was the object of the conspiracy. These crimes have already been defined for you.

The information alleges that the following actions were overt acts: preparing for, facilitating and/or aiding in the commission of the acts of shooting and/or shooting at the victim.

In order to find the defendant guilty of conspiracy to commit homicide and/or aggravated assault, serious bodily injury, and/or aggravated assault with a deadly weapon, you must be satisfied that the following three elements have been proven beyond a reasonable doubt.

First, that the defendant agreed with the other person that one or more of them would engage in conduct which constitutes the crimes that I have told you about, and/or that the defendant would aid the other in planning or committing the crime or crimes that I have already told you about.

Second, that the defendant and the other person intended to promote or facilitate the committing of the crime or crimes which I've told you about; in other words, they shared the intention to bring about what crime or to make it easier to commit that crime.

And third, that the defendant or the other person did the acts which are alleged to have been overt acts, and did them in furtherance of their conspiracy.

As a general rule, if conspirators have agreed to commit a crime and after that one of the conspirators does any act to carry out or advance their agreement, then he has done an overt act in furtherance of the conspiracy. The other conspirator does not have to participate in the act, or even know about it. In a sense they are partners, and like partners, they are responsible for each other's actions.

The Commonwealth may prove a conspiracy by direct evidence or by circumstantial evidence. People who conspire often do the conspiring secretly, and try to cover up afterwards. In many conspiracy trials circumstantial evidence is the best or only evidence on the question of whether there was an agreement, that is, a common

understanding, and whether the conspirators shared the intent to promote or facilitate committing the object crime.

Thus, you may, if you think it proper, infer that there was a conspiracy from the relationship, conduct or acts of the defendant and his alleged co-conspirator and the circumstances surrounding their activities.

You cannot convict a defendant of conspiracy if the evidence merely leads you to suspect or feel or have a hunch that he was part of the conspiracy; you must be convinced beyond a reasonable doubt.

Speaking of the evidence, keep in mind that what one conspirator does or says can be considered against another conspirator if it is done or said during the life of and in furtherance of their conspiracy. Conspirators are like partners. They can be responsible for each other's words and acts.

I want to point out that if you believe that one defendant committed the crime charged - - the crime or crimes charged, and that the other defendant was in his company, present at the scene, and knew that the other defendant was committing the crime, you cannot infer from those facts alone that the defendant was guilty of conspiracy. The defendant is not guilty unless he and the other had an agreement or common understanding and shared the intention to commit the crime or crimes.

Consider all the evidence, including the evidence of the defendant's presence and knowledge, and the words and behavior of the defendant and others, when you are deciding whether the required elements of agreement and shared intent have been proven beyond a reasonable doubt.

Put simply, if you convict the defendant of the conspiracy charge it must be because he was a party to the conspiracy, and not just a known spectator to a crime committed by his companion.

TT at 399-405.

I agree that, viewed as a whole, the instruction given by the trial court clearly and accurately

covered the elements of criminal conspiracy. Petitioner has failed to establish that there is a

reasonable likelihood that the jury applied the challenged instruction in a way that violates the

Constitution. Accordingly, Petitioner is not entitled to federal habeas relief with respect to his ninth claim.

10. Trial counsel was ineffective on appeal, and Petitioner had a right to an attorney unassociated with the Public Defender's Office on appeal, and where counsel has failed to raise any issues Petitioner is now forced to raise issues *pro se*.

Petitioner was represented at trial by Attorney Van Keuren from the Office of the Public

Defender. On direct appeal, Petitioner was represented by Attorney Vidt, also from the Office of

the Public Defender. During his PCRA proceeding, Petitioner was represented by Attorney

Kaczynski, a private attorney not associated with the Office of the Public Defender. Thus, it appears

his claim

concerns Attorney Vidt's representation on direct appeal.

An attorney owes his client a duty of loyalty, including a duty to avoid conflicts of interest.

Strickland, 466 U.S. at 688, 104 S.Ct. 2052. The attorney's duty of loyalty is the obligation of

counsel to avoid actual conflicts of interest that would adversely affect his ability to perform on

behalf of his client. Cuyler v. Sullivan, 446 U.S. 335, 345-350 (1980) (holding that prejudice is

presumed only if the defendant demonstrates that counsel actively represented conflicting interests

and that an actual conflict of interest adversely affected his lawyer's performance). To establish a

breach of that duty, the client must show the existence of an actual conflict of interest that adversely

affected the outcome of the case. *Id*. Actual conflict of interest is evidenced if during the course

of representation, the defendant's interests diverge with respect to a material factual or legal issue

or to a course of action. Specifically, the defendant must identify something that counsel chose to

do or not do, as to which he had conflicting duties, and must show that the course taken was

influenced by that conflict. Burger v. Kemp, 483 U.S. 776 (1987).

Here, Plaintiff has failed to make any showing of an actual conflict of interest by Attorney Vidt. Thus, there is no basis upon which to presume prejudice. Nor has Petitioner shown actual prejudice. Although Petitioner claims that all prior counsel were ineffective for failing to assert certain issues, counsel is not required to raise every non-frivolous issue requested by the defendant in order to protect themselves against subsequent claims of ineffectiveness. "The process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (citing Jones v. Barnes, 463 U.S. 745, 751-752 (1983)). *See also* Buehl v. Vaughn, 166 F.3d 163, 174 (3d Cir. 1999) ("One element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise."). Accordingly, Petitioner is not entitled to habeas relief on his tenth claim.

11.    The trial court failed to give an accomplice theory instruction to the jury given the nature of the charges, or failed to give a corrupt source instruction.

Petitioner claims that the trial court should have given these instructions because the court allowed a statement of his non-testifying co-defendant, Anger, to be introduced at Petitioner's trial by a police officer. In addressing this claim, the Commonwealth assumed that Petitioner was referring to Officer Garlicki's testimony, as this was the only witness testimony related to the co-defendant's statements made prior to trial. During trial, Officer Garlicki testified, in pertinent part, as follows:

> We listened to him for a while, and we basically told him, like, look, we identified everybody in the vehicle, everybody is accounted for, and its putting you in the driver's seat. So we continued to talk to him about it, and his story began to change. And he admitted that he was driving the red Chevy Malibu at the time that Jamar Melvin was shot.

He then took it from the beginning. He said that he had been picked up by a person in McKeesport. He said this person was driving a red Chevy Malibu when he was picked up. He said he had been at a girl's house. He told us that this person let him drive the car. He said he drove to Clairton, and it was their intention to get some beer and stuff, and to hang out.

He then went into when the actual shooting occurred. And what he said was that they had come through the circle and they had seen Jamar and Will Sutton. He said there was some discussion about weed, or whatnot. He said they came back around a second time, and he said that in the rear seat of the car at the time of the shooting was Blake Smith, Greg Hood and a guy called Tone Tone Phil.

He said he was driving the car and there was another person in the passenger seat. He told us that as they pulled up the second time, he thought he seen Will Sutton go to his waistband, and he said he thought Jamar had said something and went to his waistband also. He said that Jamar was standing on a bicycle with his legs on either side of the bicycle. He said that the passenger in his vehicle then opened fire, shooting it across at the victim and Will Sutton.

He said when the passenger began firing, he took the firearm he had and he also began firing. He said that he aimed at Will Sutton, and he only fired three or four rounds.

TT at 250-251.

To be entitled to the accomplice liability instruction, the evidence must show that the Commonwealth witness was an accomplice, or at least create some inference that the Commonwealth witness was an accomplice of the defendant. Commonwealth v. Collins, 957 A.2d 237, 263 (Pa. 2008). Section 306(c) of the Pennsylvania Crimes Code defines accomplice liability as follows:

(c) Accomplice defined.-A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

> (i) solicits such other person to commit it; or
>
> (ii) aids or agrees or attempts to aid such other person in planning or committing it; or
>
> (2) his conduct is expressly declared by law to establish his complicity.

18 Pa. Cons. Stat. § 306(c).  Accordingly, accomplice liability requires evidence that the person: 1) intended to aid or promote the substantive offense; and 2) actively participated in that offense by soliciting, aiding, or agreeing to aid the principal.  Commonwealth v. Rega, 593 Pa. 659, 933 A.2d 997, 1014 (2007), *cert. denied*, 552 U.S. 1316 (2008).  One merely present at the crime scene is not an accomplice; nor is one who merely helps an offender try to escape arrest or punishment an accomplice.  *Id.*

When an accomplice implicates a defendant, the trial court should tell the jury that the accomplice is a corrupt and polluted source and the jury should be instructed evaluate the witness's testimony with caution.

> A corrupt-source instruction advises the jury that if it finds that a certain witness who testified against the defendant was an accomplice of the defendant in a crime for which he is being tried, then the jury should deem that witness a corrupt and polluted source whose testimony should be considered with caution.

Commonwealth v. Collins, 957 A.2d 237, 262 (Pa. 2008).  The instruction is warranted only in cases in which there is sufficient evidence to present a jury question with respect to whether the witness is an accomplice.  *Id.*

In the instant case, an accomplice instruction was not warranted as there was no evidence to present a jury question with respect to whether Officer Garlicki was an accomplice of Petitioner.  Officer Garlicki simply testified as to Anger's confession, made to him when Officer Garlicki was

initially interviewing Anger. This was not a situation where an accomplice testified against Petitioner. Therefore, Petitioner was not entitled to either an instruction on accomplice liability or a corrupt source instruction.

Petitioner's constitutional rights were not violated by the trial court's decision not to charge the jury on an instruction which was not supported by the evidence. Hallowell v. Keve, 555 F.2d 103, 107 (3d Cir. 1977) ("Neither due process nor any other constitutional guarantee is offended by a trial judge's refusal to charge the jury on a matter not presented by the evidence."). As such, Petitioner is not entitled to habeas corpus relief with respect to his eleventh claim.

### III. CONCLUSION

Based on the discussion above, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections may constitute a waiver of that party's appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: August 11, 2010

cc:     Travis Butler
        FN2736
        SCI Coal Township
        1 Kelley Drive

Coal Township, PA 17866-1021